J-S16030-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: I.M.G., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: G.G., JR., FATHER | : : : : : : : | No. 2033 MDA 2018 |

Appeal from the Order Entered November 13, 2018
In the Court of Common Pleas of Franklin County Orphans' Court at
No(s):  2-Adopt-2017

BEFORE:  OTT, J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY MURRAY, J.:                                    **FILED APRIL 24, 2019**

G.G., Jr. (Father) appeals from the involuntarily termination of his parental rights to his minor child, I.M.G. (born May 2015) (Child), pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).[1]  After careful review, we affirm.

We recite the factual history from the trial court opinion and the record. **See** Trial Court Opinion, 11/13/18, at 1-14; **see also** N.T., 11/28/17, at 1-235; N.T., 2/21/18, at 1-71; N.T., 6/15/18, at 1-63.  Child was born in May 2015, and a week after her birth, Mother and Father moved in with S.H., paternal grandmother, and G.H., S.H.'s husband (collectively, Petitioners). However, in August 2015, Mother and Father decided to move out.  S.H. offered to care for Child until Mother and Father found a new residence. Mother and Father returned for Child, but the next day, August 7, 2015,

---

[1] By separate decree entered the same day, the court terminated the parental rights of P.M. (Mother); Mother has not appealed.

Mother and Father called Petitioners to state they were returning Child because the motel where they were staying had bed bugs. Petitioners filed an emergency petition for special relief seeking custody of Child. Following hearings, Petitioners were granted sole legal and physical custody, with Mother and Father to have weekly supervised visits at ABC House, paid for by Petitioners. While Mother and Father could request additional visits, they would have to pay for the additional visits. Supervised visitation began October 4, 2015; a finalized custody order was entered December 3, 2015.

Mother and Father attended supervised visits regularly between October 4, 2015, and April 18, 2016. However, after visits became sporadic in late April and May 2016, ABC House informed Mother and Father that they would need to contact ABC House to resume visitation. Father did so on October 12, 2016, by voice message. ABC House staff were initially unable to reach Father in return, because he had not set up his voicemail. After eventually making contact and setting up a meeting, Father and Mother attended a visit on December 4, 2016, but missed December 11, 2016 and December 18, 2016 visits. They attended a January 8, 2017 visit, but missed the January 15, 2017 visit. Mother and Father were then required to confirm appointments two hours prior. Father attended visits on January 22, 2017, January 29, 2017, and February 5, 2017.

On January 31, 2017, Petitioners filed a petition for involuntary termination of Mother's and Father's parental rights pursuant to 23 Pa.C.S.A.

§ 2511(a)(1), (2), and (b).[2]  Father was served with the petition on February 28, 2017.

Evidentiary hearings were held November 28, 2017, February 21, 2018, and June 15, 2018.  Child was represented by Anne M. Shepard, Esquire, as legal counsel and guardian *ad litem* (GAL).[3]  Mother, Father, and Petitioners testified.  In addition, Elizabeth Martin, ABC House parent supervisor; Emilee Bakner, the director of ABC House; and J.M., Mother's stepfather, testified.

At the conclusion of the hearing, Child's GAL noted that she had observed visits with Child and her parents.  Child was more comfortable with Father than Mother.  Regardless, Attorney Shepard was concerned about Father's 14-year struggle with drug addiction, and his ability to maintain stability going forward; Attorney Shepard opined that it was in Child's best interests for Mother's and Father's parental rights to be terminated.

On August 3, 2018, following the close of evidence but prior to the rendering of a decision, the trial court recused itself following the receipt of *ex parte* information regarding Father, and the matter was reassigned to another judge.  **See** Order, 8/3/18, at 1-2; **see also** Order, 8/7/18, at 1.  The trial

---

[2] On the first day of hearings, Petitioners withdrew their petition for termination under Section 2511(a)(2).

[3] In the order appointing Attorney Janice Hawbaker in the dual role, the court noted Child's tender years and found there was no conflict between Child's legal and best interests.  **See** Order, 4/4/17, at 1-2.  Due to an unrelated conflict, Attorney Hawbaker was later replaced as GAL and legal counsel by Attorney Shepard.  **See** Order, 9/5/17, at 1.  Accordingly, Attorney Shepard's representation satisfies Child's statutory right to counsel.  **See In re L.B.M.**, 161 A.3d 172 (Pa. 2017); **see also In re T.S.**, 192 A.3d 1080 (Pa. 2018).

court issued an order that all parties file written argument regarding their positions. *See* Order, 8/17/18, at 1; *see also* Order, 8/27/18, at 1. Subsequently, Child's GAL/counsel, Father, Mother, and Petitioners filed briefs. Notably, Father did not raise the issue of recusal and lack of further hearings before the re-assigned trial judge, nor did he request additional hearings or testimony before the court. *See* Father's Brief in Support of Denying Petition to Involuntary [*sic*] Terminate His Parental Rights, 10/22/18, at 1-7 (unpaginated).

On November 13, 2018, the trial court by opinion and order granted the petition and involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b). Father filed a timely notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issues for our review:

1. Whether the trial court committed reversible error when it made findings of fact and rendered a decision on the termination of parental rights of Father based on the cold record without observing the testifying witnesses during the three-day long hearing and did not preside over the hearing?

2. Whether the trial court erred in involuntarily terminating Father's parental rights under 23 Pa.C.S. § 2511(a)(1) when [F]ather had made contact for visitation and was visiting with the child for four of the six-months [*sic*] prior to the filing of the petition for termination of parental rights?

3. Whether the trial court erred when it involuntarily terminated Father's parental rights without giving primary consideration to the effect the termination would have on the child's established

and strong relationship with Father as required by 23 Pa.C.S. § 2511(b)?

Father's Brief at 4.

We review the termination of parental rights as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

In Father's first issue, he argues that the court erred when it made findings of fact and issued a termination decree where it had not observed the witnesses and did not preside at the hearing. *See* Father's Brief at 9. Father argues that credibility determinations were a major factor in this case and the majority of the testimony was in conflict, including the level of the bond between Father and Child, and how often Father asked to see Child and begin unsupervised custody. *Id.* at 9.

As noted *supra*, the trial judge originally assigned to the matter recused himself after presiding at the hearings which occurred over the course of nearly a year. Upon reassignment, the parties submitted briefs to the trial court, which rendered its opinion and order. Thus, prior to reaching the merits

of Father's first issue, we must determine whether Father has properly preserved it.  *See* Pa.R.A.P. 302(a) (issues not raised in the lower court are waived and cannot be raised for the first time on appeal).

Father did not challenge the substitution of the trial judge in the court below, nor did he request any further hearings.  Instead, Father submitted his brief on the merits without timely and specific objection.  The trial court addressed the recusal issue *sua sponte* in its November 13, 2018 opinion, citing **In re I.E.P.**, 87 A.3d 340 (Pa. Super. 2014), and noting that where the matter was factually driven, did not turn on credibility, and had been pending for some time, it was in the best interests of the child to proceed without an additional evidentiary hearing before the re-assigned trial court.  **See** Trial Court Opinion, 12/13/18, at 3-4; **see also** Trial Court Opinion, 11/13/18, at 14, citing **I.E.P.**, 87 A.3d at 347.

Upon review, however, we conclude that because Father did not raise the recusal issue with the trial court, he has failed to preserve the issue on appeal; accordingly, it is waived.  **In re S.C.B.**, 990 A.2d 762, 767 (Pa. Super. 2010) (finding waiver when Mother failed to raise an objection at the termination of parental rights hearing).

We thus turn to Father's remaining two issues.  Termination requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of his

or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, we focus on subsection (a)(1) and (b), and recognize:

we are instructed that we may not consider any effort by the parent to remedy the conditions described in subsections (a)(1), (a)(6) or (a)(8) if that remedy was initiated after the parent was given notice that the termination petition had been filed. Further, this evidentiary limitation applies to the entire termination analysis. The court, however, may consider post-petition efforts if the efforts were initiated before the filing of the termination petition and continued after the petition date.

*In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (some citations and

quotations omitted).

The relevant subsections of 23 Pa.C.S.A. § 2511 provide:

**(a)** **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\*\*\*

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights

- 7 -

of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

With regard to Section 2511(a)(1), "[a] court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition."

**Z.P.**, 994 A.2d at 1117. With respect to Section 2511(a)(1), our Supreme Court has held:

> [o]nce the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

**In re Adoption of Charles E.D.M.**, 708 A.2d 88, 92 (Pa. 1998).

Furthermore:

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

**In re N.M.B.**, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

Father argues that the court erred in terminating his rights under Section 2511(a)(1) because he made contact for visitation and was visiting with Child for four of the six months prior to the filing of the petition. *See* Father's Brief at 11. He contends that he has maintained a relationship with Child for her entire life, and was regularly visiting Child when the petition was filed. *Id.* at 13. Father also claims he was prevented from performing parental duties by Petitioners and the trial court. *Id.*

Initially, we note that pursuant to statute, the operative period to consider is six months prior to the filing of the termination petition. *See* 23 Pa.C.S.A. § 2511(a)(1). The petition in this case was filed January 31, 2017; accordingly, we consider the period between July 31, 2016 and January 31, 2017. The record reflects that Father did not have contact with Child or with ABC House between July 17, 2016, and October 12, 2016. During that time, Father did not inquire about, speak with, or visit Child. Between December 4, 2016, and the date of the filing of the termination petition, Father visited with Child twice, on December 4, 2016, and January 8, 2017. He missed scheduled visits on December 11, 2016, December 18, 2016, and January 15, 2017. He attended visits on January 22, 2017, and January 29, 2017. During the relevant time period, Father saw Child a total of five times.

Petitioners testified and presented additional witnesses. S.H. testified that she is Child's paternal grandmother. *See* N.T., 11/28/17, at 24. She noted that Father accrued new criminal charges in September 2016. *Id.* at

56. S.H. testified that Father's visitation with Child was sporadic during the relevant time period and that she was concerned about visitation because Child did not know Father and was "frantic" when Petitioners left her alone with Father, and very "clingy" with Petitioners after the visits. *Id.* at 58, 73-74, 82. Pursuant to a custody order, Petitioners paid for the supervised visits. *Id.* at 59. Father never contacted S.H. to arrange visits with Child, nor did he ask for additional visits or otherwise ask about Child. *Id.* at 60, 65.

S.H. believed that Father knew of her intention to file a petition to terminate his parental rights as of December 2016, and testified that she received a Facebook message from Father regarding the termination on January 29, 2017. *Id.* at 29-32. Father was very angry with S.H. *Id.* at 63-64. This communication was one of the few contacts she had with Father, other than Father asking for help with his cell phone bill. *Id.* at 60-61. S.H. acknowledged that Father may have brought Child a stuffed animal for Christmas but did not otherwise provide for any of Child's physical or emotional needs or financial support, other than sporadically attending two-hour supervised visits. *Id.* at 65-66, 77-78.

S.H. denied doing anything to prevent Father from having contact with or inquiring about Child. *Id.* at 77-78. S.H. denied that she had refused to accept financial support for Child. *Id.* S.H. described her relationship with Child as that of mother and daughter. *Id.* at 77-79. Child did not know Father at visitation at first, but around February 2017, Child seemed more

comfortable around Father. *Id.* at 106. However, S.H. has never heard Child call Father "dad" or "daddy." *Id.*

G.H. testified that he is married to S.H. *See* N.T., 2/21/18, at 3-4. He stated that he has a good relationship with Child, as though she is his daughter; Child calls him "Daddy." *Id.* at 4-6. G.H. described activities he engages in with Child, including caring for her physical needs, cooking with her, going to church, and hiking. *Id.* at 5-6. G.H. stated that Father never contacted him to visit with Child, never provided financial support or for any physical needs of Child, and never provided for Child's psychological or emotional needs. *Id.* at 7-8. G.H. expressed concerns about Father's lack of stability, and Father's issues with housing and sobriety. *Id.* at 7-8. G.H. denied refusing to allow Father to contact or see Child. *Id.* at 9.

Elizabeth Martin, ABC visitation supervisor, confirmed that Father did not visit Child between June 2016 and December 4, 2016. *See* N.T., 11/28/17, at 13-14. Father never brought food, diapers, or other supplies to visits. *Id.* at 20. Ms. Martin described Father's interactions with Child as "nervous" and averred that he lacked parenting skills. *Id.* at 21.

Emilee Bakner, the director of ABC House, testified that she is the supervisor who generates all reports in supervision cases. *See* N.T., 11/28/17, at 125-127. Ms. Bakner confirmed that Father had three "no shows" between May 2, 2016, and June 6, 2016, and was notified that he would need to contact ABC House to resume visitation, and did not do so until

November 2016. *Id.* at 140. After resuming visitation, Father had three more "no shows." *Id.* On average, Father was late to visits by approximately twelve minutes, did not provide any supplies for Child, was unsuccessful at soothing Child, and had difficulty setting structure and boundaries, although he showed a nurturing attitude toward Child. *Id.* at 141-42, 146.

Thereafter, J.M., Mother's stepfather, testified on behalf of Mother and Father. *See* N.T., 11/28/17, at 209-10. J.M. testified that Father is able to financially support the family. *Id.* at 215-17. J.M. claimed that Father had stopped using drugs and had been working for "maybe two months." *Id.* at 228-30. Mother and Father lived in his house for a time near the end of 2016. *Id.* at 209-30.

Mother testified that she and Father moved in with Petitioners shortly after Child's birth. *See* N.T., 2/21/18, at 23-24. Father and Mother then moved into a motel, but moved back in with S.H. and G.H. after discovering that the motel had bed bugs. *Id.* at 24. Mother and Father left Child with Petitioners because they were living in their car. *Id.* at 26. Mother admitted to "some" drug use, but testified she has been clean since she was incarcerated and attended rehab. *Id.* Mother admitted she had money to make phone calls and send letters from prison, but made no attempt to contact Child because "it's just like beating a dead horse. There's no point." *Id.* at 30. She also admitted she had not contacted Petitioners about extra visits, or provided financial assistance for Child. *Id.* at 51. Mother claimed

that she and Father have an "amazing" bond with Child, and that Child calls Father "daddy," but conceded she did not contact Petitioners to ask about extra visitation. *Id.* at 42-43, 59.

Father confirmed that when Child was first born, he and Mother cared for her. *See* N.T., 6/15/18, at 9-10. They then moved in with Petitioners, moved out, and lived in their car and a motel. *Id.* at 10-11. He admitted that at that time, he was addicted to drugs. *Id.* at 13. Father stated that he stopped attending visitation because his car broke down and he did not get it repaired because he spent all of his money on drugs. *Id.* at 14-15. When Father attempted to resume visitation, he had difficulty because his phone was not working. *Id.* at 15. Father testified that Child is affectionate with him but does not have as close of a bond as he would like; it is difficult when he sees Child for only a few hours a week. *Id.* at 17-18. Father testified that there was a "step down" in the accompanying custody case, but after that order, Petitioners "made" him pay for visits when he also has to pay for drug treatment. *Id.* at 21-25. Father testified that he has had difficulty with addiction but that he is working on staying clean; he also conceded that prior to January 2017, he did not have a stable residence where he could bring Child. *Id.* at 23-25, 40-41.

On this record, the court determined that Father had essentially abandoned Child for four months of the relevant six-month time period. Even after resuming visitation, Father attended 57% of the available visits, and was

late to the visits he did attend. Further, the record established that Father suffered from drug addiction and prioritized his addiction over his responsibility to Child. The record also reflects that Father's only contact with Child was during visitation; he made no effort to inquire about, request further visitation, contact Petitioners about increasing visitation, or in any way become involved in Child's life. There is no evidence or testimony that Father attempted to send letters or cards to Child, or asked to speak to her on the phone. There is no evidence or testimony that Father ever expressed any interest in her development or upbringing. There is no evidence that Father provided financial support for Child.

The trial court articulated its reasoning:

It is evident that Mother and Father have experienced financial difficulties and drug addiction which have impeded them from obtaining and maintaining the adequate housing necessary to progress in the graduated custody schedule in place since September 4, 2015. Mother's and Father's financial difficulties appear to at least partially explain their decision to not seek additional visits with [Child] at ABC House. Certainly transportation was an issue, as well.

While we sympathize with Mother's and Father's struggles with addiction and financial hardship, we find no satisfactory explanation in the record for their failure to inquire into [Child]'s development and well-being. The parental obligation is an "affirmative duty" that "requires continuing interest in the child and a genuine effort to maintain communication and association with the child." **B.,N.M.**, 856 A.2d at 855. Nothing in the record suggests that Mother or Father reached out to Petitioners through any means to request pictures or information about [Child]. It is difficult to imagine a parent having no interest in their young child reaching major developmental milestones. Not drug addiction nor incarceration nor financial instability would prevent such an inquiry. Moreover, Father's Facebook messages state he does not

want to give up his parental rights; the messages do not request information about [Child] and cannot be construed as evidence of any effort on Father's part to re-establish the parental relationships or undertake parental responsibility.

Finally, we address Mother's and Father's repeated contentions that Petitioners have obstructed Mother's and Father's ability to act as parents to [Child]. Despite Mother's and Father's allegations, we find no evidence of record showing any meaningful obstruction on the part of Petitioners. Petitioners have complied with the Custody Order by bringing [Child] to the weekly ABC House visits and providing the financial support for those visits to occur. Ms. Martin's testimony further shows that Petitioners requested that she extend the waiting period when Mother and Father were tardy. Additionally, Petitioners have offered financial help to Mother and Father by paying for hotel rooms and Father's cell phone bill.

A parent "must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." **B.,N.M.**, 856 A.2d at 855. If, as Father contends, Petitioners did not comply with the Custody Order when Mother and Father obtained appropriate housing, redress was available through the custody court. Likewise, Mother's statement that Petitioners would have denied any request for a visit with [Child] while she was in prison carries no weight when Mother at no point attempted such a request. We therefore find that Mother and Father have failed to exercise reasonable firmness in resisting obstacles purportedly placed by Petitioners or their life circumstances.

Trial Court Opinion, 11/13/18, at 22-23. Upon review, we discern no error of law or abuse of discretion in the trial court's determination.

Accordingly, the trial court appropriately concluded that competent, clear, and convincing evidence supported the termination of Father's parental rights pursuant to Section 2511(a)(1), because Father, for a period of six months, failed to perform parental duties. **See In re K.Z.S.**, 946 A.2d 753, 757 (Pa. Super. 2008).

Next, we consider whether Child's needs and welfare will be met by termination pursuant to Subsection (b). *See Z.P.*, 994 A.2d at 1121. "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.* The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. *Id.* Ultimately, the concern is the needs and welfare of a child. *Id.*

We have stated:

[b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*Z.P.*, 994 A.2d at 1121 (quoting *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000)). The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Father argues that termination under Section 2511(b) is not appropriate because Child has a relationship with him, refers to him as "daddy," and this relationship should be preserved. *See* Father's Brief at 14-15.

The trial court discussed its Section 2511(b) findings as follows:

We find that termination of Mother and Father's parental rights is in the best interest of [Child].

[Child] has been living in Petitioners' home since one week after her birth. Her care has been exclusively undertaken by Petitioners since August of 2015. Her physical, emotional, and developmental needs are well met by Petitioners.

Although Father and Mother have attended supervised visits at ABC House—with varying degrees of consistency—since October 2015, it is clear that Mother and Father have been limited in their ability to bond with [Child] due to the September 4, 2015 Custody Order. We are cognizant that the Custody Order provided parameters within which Mother and Father could have physical custody of [Child] and therefore develop a parent-child bond. However, Father and Mother did not take advantage of the Custody Order's mechanism for increasing their time with [Child] . . . We remain aware that parental rights may not be terminated "on the basis of environment factors"; however, we believe that these parents were capable of greater effort and dedication in regaining custody of their child than they have shown here. For example, the evidence shows that Mother moved into her Mother and [G.H.'s] home at the end of October 2016. Father moved into the home in December 2016. Despite obtaining adequate housing, Father and Mother failed to submit documentation of their living situation to Petitioners before the Petition was filed at least one month later.

[Child] deserves parents able to show dedication and commitment to meeting her physical, emotional, and developmental needs. Mother and Father have thus far failed to demonstrate commitment by, *inter alia*, neglecting to make inquiries about her well-being and failing to take the initiative to increase their physical custody . . .

Petitioners intend to adopt [Child] and raise her as their daughter. [Child] looks to Petitioners to fulfill her physical and emotional needs. She calls Petitioners "Daddy and Mom-Mom." We find that Petitioners and [Child] have a parent-child bond, and see no reason why [Child]'s life should continue to "be held in abeyance while [Parents] attempt[] to attain the maturity necessary to assume parenting responsibilities." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Based on the foregoing, we find termination of Mother's and father's parental rights to best serve [Child]'s needs and welfare.

Trial Court Opinion, 11/13/18, at 26-27 (footnote omitted).

Again, we discern no abuse of discretion in the trial court's conclusion. Although Father testified that he and Child shared a bond, and that Child called Father "daddy" and ran to him during visitation, there was other evidence that supported the trial court's decision to put Child's need for security and stability ahead of this limited bond. *See*, *e.g.*, *N.A.M.*, 33 A.3d at 103 (noting that the court may emphasize safety needs of child and consider intangibles such as the security and stability offered by a foster parent). Similarly, while Father has expressed his love of Child, this Court has stated that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007). Instantly, the evidence supports the trial court's finding that Child's best interests and long-term stability would be best served by the termination of Father's parental rights. *N.A.M.*, 33 A.3d at 103.

In sum, the evidence supports the trial court's termination of Father's parental rights under Section 2511(a)(1) as well as the Section 2511(b).

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/24/2019